No. 05-200

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 347

_____

IN THE MATTER OF THE CONTESTED HEARING
OF THE PROTEST BY REIER BROADCASTING
COMPANY RELATED TO REQUEST FOR
PROPOSAL #02-03 OF MONTANA STATE
UNIVERSITY-BOZEMAN

_____

APPEAL FROM:     District Court of the Eighteenth Judicial District,
                 In and for the County of Gallatin, Cause No. DV 2004-112
                 The Honorable Mike Salvagni, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

             John M. Kauffman, Kasting Kauffman & Mersen, Bozeman, Montana

        For Respondent:

             Leslie Taylor, Montana State University, Bozeman, Montana

_____

                              Submitted on Briefs:  November 30, 2005

                                         Decided: December 28, 2005

Filed:

        _____
                        Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1      Reier Broadcasting Company (RBC) appeals from a decision of the Eighteenth Judicial District, Gallatin County, affirming the agency determination of Montana State University-Bozeman (MSU).  We affirm.

¶2      We address whether the District Court appropriately affirmed the agency determination that MSU properly deemed RBC's bid non-responsive.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3      RBC owns and operates various radio stations in the Bozeman area.  It held a contract with MSU for the exclusive broadcasting rights of MSU athletic events from 1997 to 2002.  The contract required RBC to pay a minimum "talent fee" of $50.00 per show to MSU coaches who appeared on weekly shows broadcast by RBC's radio stations.

¶4      MSU hired football coach Michael Kramer (Kramer) in 1999 and agreed to pay him a salary of $120,000 per year.  MSU discovered later, however, that it only had the resources to pay $80,000.  Bruce Parker (Parker), the associate athletic director for MSU, approached William Reier (Reier), the president and owner of RBC to discuss whether RBC would be willing to pay Kramer approximately $10,000 per year as a "radio stipend" to help cover the deficit in his salary.  Reier agreed and RBC and Kramer entered into a contract in January 2001.  RBC agreed to pay Kramer approximately $10,000 per year in exchange for Kramer's promise to appear on various shows on RBC radio stations. *See Reier Broadcasting Co., Inc. v. Kramer*, 2003 MT 165, ¶ 4, 316 Mont. 301, ¶ 4, 72 P.3d 944, ¶ 4.  RBC also entered into a similar contract with Mick Durham, the head men's basketball coach at MSU.  Reier maintains that RBC stopped paying a separate talent fee to Kramer and Durham once it

2

entered into the personal service contracts with the two coaches.

¶5     MSU issued a request for proposal (RFP) soliciting bids for a new broadcasting contract in early 2002. RBC submitted a proposal in response to the RFP with the hope of retaining its contract to broadcast MSU athletic events. RBC listed Dean Alexander (Alexander), the veteran radio personality touted as the "Voice of the Bobcats," as its announcer for football and men's basketball. Clear Channel Radio and Northern Broadcasting System also submitted proposals to MSU. The RFP required the successful bidder to pay coaches a talent fee similar to the existing contract with RBC.

¶6     Reier expressed concern to MSU officials regarding the RFP's talent fee provision. He pointed out that RBC already paid Kramer and Durham substantially more for appearing on RBC radio broadcasts under their personal service contracts. Reier also noted that those contracts could preclude Kramer and Durham from appearing on the radio broadcasts of another station if RBC were not the successful bidder. *See Reier Broadcasting Co.,* 2003 MT 165. MSU officials recognized the potential problem but issued a written response on April 12, 2002, advising that the "issue will be addressed after the evaluation committee has completed the evaluation process and has determined the successful offeror."

¶7     The RFP explained that the evaluation committee would separate proposals into responsive and non-responsive offers. The committee then would evaluate the remaining proposals to determine whether to award the contract to the best proposal or seek further "discussion/negotiation" before awarding a contract.

¶8     The evaluation committee met to consider the responsiveness of the three proposals on May 16, 2002. MSU officials distributed the "Rules of Engagement" to the evaluation

3

committee members. The rules consisted of nine steps for the committee to follow for the evaluation of proposals. The final step of the rules allowed for MSU to "enter into negotiations with the successful offeror" after the evaluation committee makes a written recommendation as to whom the contract should be awarded to. The committee found the proposals of both RBC and Clear Channel responsive, although RBC's proposal received a higher score. The minutes of the meeting stated that the evaluation committee planned to recommend RBC and that MSU planned to begin negotiations with RBC regarding the talent fee issue.

¶9 The committee minutes further stated that MSU intended to ask RBC "to provide the women's basketball coach $5,000 per year" for talent fees, with a $1000 a year escalation, until the amount reached the same level of the personal service contracts of Kramer and Durham. The evaluation committee stated that MSU should seek a $100 per show talent fee for the women's coach as a fallback provision. The evaluation committee held no meetings after May 16, 2002.

¶10 Parker assumed that MSU would award the contract to RBC after the evaluation committee's May 16, 2002, meeting. He mentioned to RBC representatives that they appeared to have submitted the best proposal and likely would be the successful offeror. Parker printed schedules and posters with the logo of one of RBC's radio stations that he billed to RBC. Parker even requested that RBC broadcast various radio commercials on behalf of MSU after the existing contract had expired on May 31, 2002.

¶11 MSU and Reier met to discuss certain provisions of the RFP on June 26, 2002. Reier refused to pay Kramer and Durham a talent fee in addition to the money they received under

4

their personal service contracts. Reier also refused to pay the head women's basketball coach a talent fee. The parties did not resolve the issue at the meeting. MSU officials warned Reier that RBC's refusal to comply with the RFP's talent fee requirement could result in RBC's proposal being deemed non-responsive.

¶12 Alexander, RBC's proposed lead announcer, accepted a job with a different radio network in Billings around July 4, 2002. He called Reier to advise him of the situation on July 10, 2002. Reier did not immediately contact MSU officials to inform them of Alexander's departure. Reier later claimed that Alexander mentioned in the July 10, 2002, call only that he was considering the position in Billings, but that he had not yet accepted.

¶13 MSU officials soon learned independently of Alexander's planned departure. MSU asked Reier to submit an updated proposal listing his new announcers. Reier responded by listing Dave Visscher (Visscher) and Dan Davies (Davies) as the football announcers and Visscher for men's basketball. Peter Fields (Fields), the MSU athletic director, immediately held a meeting on July 16, 2002, to discuss the new developments. At the meeting Fields telephoned Davies who advised Fields that he had not yet agreed to serve as an announcer for RBC. Fields and MSU found the uncertainty surrounding RBC's proposed announcers to be unacceptable in light of Davies's statement that he had not yet agreed to RBC's proposal. Moreover, MSU officials felt that Reier inappropriately had withheld critical information regarding the proposed announcers included in RBC's proposal.

¶14 MSU faxed a letter to Reier advising him that RBC's proposal had been deemed non-responsive on July 16, 2002. MSU deemed RBC's proposal non-responsive under Rule 2.5.602(7)(A), (C), ARM, due to the unresolved dispute over the talent fee. MSU also

5

deemed RBC non-responsible based on Reier's failure to provide accurate information regarding the change in announcers as part of RBC's proposal. MSU awarded the contract to Clear Channel on July 24, 2002.

¶15 RBC requested a contested case hearing. A hearing officer heard testimony from witnesses and considered exhibits submitted by RBC and MSU during a three-day hearing held from February 19-21, 2003. The hearing officer ruled in favor of MSU. Geoffrey Gambel, the president of MSU, held a non-evidentiary hearing on November 14, 2003, and adopted the hearing officer's findings on February 11, 2004. RBC filed a petition for judicial review.

¶16 RBC contended that MSU had violated Rule 2.5.602(7), ARM, by deeming its proposal non-responsive after the evaluation process had ended. RBC asserted that MSU's Rules of Engagement and criteria accompanying the RFP had limited the evaluation process to the meetings of the evaluation committee. The evaluation committee held its last meeting on May 16, 2002. MSU declared RBC's proposal non-responsive on July 16, 2002. The District Court affirmed the agency decision in an order dated January 21, 2005. This appeal followed. RBC also argues on appeal that MSU violated Rule 2.5.602(10), ARM, when the MSU athletic director deemed its proposal non-responsive rather than the evaluation committee.

**STANDARD OF REVIEW**

¶17 We review an administrative agency's findings of fact to determine whether they are clearly erroneous. *Lewis v. B & B Pawnbrokers, Inc.*, 1998 MT 302, ¶ 18, 292 Mont. 82, ¶ 18, 968 P.2d 1145, ¶ 18. This Court reviews an agency's conclusions of law to determine

6

whether the conclusions are correct. *Key West, Inc. v. Winkler*, 2004 MT 186, ¶ 13, 322 Mont. 184, ¶ 13, 95 P.3d 666, ¶ 13.

## DISCUSSION

¶18    The Procurement Act states that a contract must be awarded "to the responsible and responsive offeror whose proposal best meets the evaluation criteria." Section 18-4-304(5), MCA. The Procurement Act provides that requests for proposals "must state the evaluation criteria and their relative importance." Section 18-4-304(5), MCA. A contract award will be "based upon an evaluation process using stated criteria to arrive at a contract that will be the most advantageous to the state." Rule 2.5.602(1), ARM. A state entity may find a proposal non-responsive at any time during the evaluation process if "any of the required information is not provided" or "the proposal is not within the plans and specifications described and required in the request for proposal." Rule 2.5.602(7)(A), (C), ARM.

¶19    RBC contends that MSU violated Rule 2.5.602(7), ARM, by determining its proposal non-responsive after the "evaluation process" had ended. RBC contends that MSU created a two stage process, evaluation and negotiation, according to the terms of the RFP and the Rules of Engagement. RBC alleges that the evaluation process ended when the committee disbanded following its determination on May 16, 2002, that RBC's proposal met all the criteria. RBC contends that it and MSU then entered negotiations following the evaluation committee's last meeting. Thus, RBC argues that MSU could not find its proposal non-responsive during the subsequent negotiation stage under Rule 2.5.602(7), ARM.

¶20    RBC attempts to draw a distinction between "negotiations" under the Rules of Engagement and "discussions" under the Administrative Rules of Montana. *See* Rule

7

2.5.602(7), (8), ARM. RBC concedes that the evaluation process includes discussions, but distinguishes negotiations that take place after the evaluation process. RBC asks this Court to interpret "discussions" and "evaluation process" too narrowly. A state entity uses the evaluation process "to arrive at a contract that will be most advantageous to the state." Rule 2.5.602(1), ARM. The evaluation process concludes when the parties arrive at a contract, not before. Thus, the evaluation process contemplated by the RFP and the accompanying Rules of Engagement included negotiations of unresolved issues as well as discussions pursuant to the administrative rules.

¶21 A rule prohibiting the state entity from finding a proposal non-responsive during negotiations would contravene the intent of the Procurement Act. The Procurement Act requires that a contract must be awarded "to the responsible and responsive offeror whose proposal best meets the evaluation criteria." Section 18-4-304(5), MCA. A state entity must retain the power to find a proposal non-responsive when a party refuses to conform to an RFP or substantially alters its proposal. RBC refused to amend its proposal to conform with the talent fee provision of the RFP. RBC also failed to inform MSU immediately of a critical change in its proposal when Alexander left RBC. Finally, MSU did not find RBC's proposed new announcers acceptable when Davies equivocated on his availability.

¶22 RBC also claims that the conduct of MSU officials confirmed that the evaluation process had ended following the evaluation committee's last meeting on May 16, 2002. This conduct included Parker's comment to RBC officials that it likely would get the bid and Parker's decision to bill RBC for MSU athletic schedules with RBC's logo. Parker also asked RBC to broadcast MSU commercials after the May 31, 2002, expiration of its existing

8

broadcast contract. RBC further points to the evaluation committee's written response to RBC's concern about the conflict between the RFP's talent fee criteria and the personal service contracts with Kramer and Durham. The committee stated that the talent fee issue would be resolved "after the evaluation committee has completed the evaluation process and has determined the successful offeror." RBC contends that these actions led it to believe that its proposal was no longer in jeopardy of being deemed non-responsive.

¶23 Apart from these actions, however, MSU officials put RBC on notice that its non-compliance with the RFP talent fee provision could result in RBC's proposal being deemed non-responsive. MSU discussed the talent fee issue on June 26, 2002, long after the evaluation committee's last meeting. MSU provided RBC with notice of the consequences of its continued non-compliance with the talent fee requirement at the June meeting.

¶24 RBC also maintains that MSU acted contrary to its stated evaluation criteria and violated Rule 2.5.602(10), ARM, when Fields found RBC's proposal non-responsive rather than the evaluation committee. An evaluation "shall be based on the evaluation criteria set forth in the request for proposals." Rule 2.5.602(10), ARM. RBC contends that the "evaluation criteria" of the RFP mandated that only the evaluation committee could make a determination of non-responsiveness or non-responsibility.

¶25 We agree with the District Court that MSU properly reviewed RBC's proposal based on the evaluation criteria. Reference to the evaluation committee in the RFP merely represented a statement of procedure rather than actual evaluation criteria. Fields found RBC's proposal non-responsive based on its failure to comply with the talent fee provision. He also based his determination of RBC's non-responsibility on RBC's failure to convey

9

immediately the information concerning Alexander to MSU and its later misrepresentation that Davies had agree to serve as an announcer for RBC. The evaluation criteria did not restrict responsibility for determining the non-responsiveness or non-responsibility of a proposal to the evaluation committee.

¶26 MSU's conduct in this matter and the accompanying dispute with RBC regarding the personal service contract for Kramer and Durham certainly has not clothed it in glory. *See Reier Broadcasting Co.*, ¶¶ 22-26 (Cotter, J. dissenting). On the other hand, none of its questionable actions have risen to the level of circumventing the protections afforded to state entities by the Procurement Act. The Procurement Act provides these protections, in part, to "maximize to the fullest extent practicable the purchasing value of public funds of the state." Section 18-4-122(6), MCA. The Procurement Act seeks to maximize this purchasing value by allowing a state entity to ensure full compliance with an RFP up to the point of entering into a contract with a supplier. We agree with the District Court that RBC's interpretation of the RFP and the accompanying Rules of Engagement would defeat this intent and tie the hands of a state entity in a manner not contemplated by the Procurement Act.

¶27 Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ JOHN WARNER
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

/S/ PATRICIA O. COTTER